# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| KATRINA VAN VALEN, <br><br> *Plaintiff,* <br><br> v. <br><br> EMPLOYEE WELFARE BENEFITS COMMITTEE NORTHROP GRUMMAN CORPORATION, <br><br> *Defendant.* | CIVIL NO. 3:09cv00070 <br><br><br> <u>MEMORANDUM OPINION</u> <br><br><br> JUDGE NORMAN K. MOON |

Plaintiff Katrina Van Valen ("Ms. Van Valen" or "Plaintiff") seeks to recover long term disability benefits allegedly due under a benefit plan insured through a policy issued by Unum Life Insurance Company of America ("Unum"). Unum is the agent and third-party administrator for defendant Employee Welfare Benefits Committee Northrop Grumman Corporation ("Defendant").[1] The parties have filed cross motions for summary judgment (docket nos. 18 and 20) and supporting materials (docket nos. 21, 23-26). Counsel have informed the court that they do not desire a hearing.

For the reasons given herein, I find that Defendant did not abuse its discretion in denying Plaintiff's long term disability benefits claim. Therefore, Defendant's motion for summary judgment will be GRANTED and Plaintiff's motion for summary judgment will be DENIED. An appropriate order will follow.

---

[1] Unum is not a party to this action. Defendant does not dispute Unum's agency relationship with Defendant.

# I. BACKGROUND AND FACTS

Plaintiff worked as an epidemiologist for a subsidiary of Northrop Grumman Corporation from approximately September 25, 2006 through December 5, 2006. Administrative Record ("AR") 482-484. In that role, she was assigned to work at the Centers for Disease Control and Prevention ("CDC") in Atlanta, Georgia. AR 533. The job was largely sedentary, requiring her to analyze data, write papers, propose and manage research projects, and make presentations. AR 533. Through her employment, Ms. Van Valen participated in an employee benefit plan funded, at least in part, by a group disability insurance policy issued by Unum (the "Policy"). AR 830-874.

## A.

Beginning in late November 2006, Plaintiff became ill, reporting symptoms of bronchitis, "profound fatigue" and a general "achy" feeling. AR 46-50. She stopped working on December 5, 2006. At the time, she reported numerous other symptoms and conditions, which are not directly the subject of this suit.[2] At a December 15 appointment with her primary care physician, Dr. Kaplan, she again reported body aches and "profound fatigue." On January 12, 2007 she had symptoms of "sinus congestion and fatigue." Dr. Kaplan surmised that "[s]he does not look ill, but is blowing her nose frequently and does sound as though she has sinus congestion." AR 46-47. Plaintiff's sinus condition appears to have abated after a lengthy period, and at any rate does not form the basis of her disability claim in this case.[3]

In the ensuing months, Dr. Kaplan began referring Ms. Van Valen to specialists to aid in

---

[2] The Policy contained a pre-existing conditions provision that excluded coverage for conditions for which the policyholder "received medical treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the three months just prior to [the] effective date of coverage." AR 854. Plaintiff concedes that she was properly denied coverage for complaints related to anxiety and other affective disorder, asthma/bronchitis, chronic headaches, and lower back pain, under the pre-existing conditions clause.

[3] Plaintiff's Motion for Summary Judgment refers to Chronic Fatigue Syndrome as "[P]laintiff's disabling condition." (docket no. 20 at 16).

achieving an accurate diagnosis. In February 2007, an infectious disease specialist, Dr. Capparell, performed a full blood and laboratory panel screening. His impression included chronic fatigue, fevers of unknown origin, and depression. AR 80-81.

After an office visit on March 5, 2007, Dr. Kaplan again noted that Chronic Fatigue Syndrome ("CFS") was a possibility. However, he also suspected that depression and polypharmacy might have a role in Plaintiff's fatigue. AR 109. After another visit on April 2, 2007, Dr. Kaplan again noted that he suspected CFS, but he also suspected a sleep disorder. He opined that "I do not think she can presently work at least nowhere near full-time." AR 111-112. He referred Ms. Van Valen to Dr. Westerman, a sleep specialist. AR 109-112. Dr. Westerman concluded that the cause of Plaintiff's fatigue was "elusive" but expressed "doubt that there is a specific sleep disorder such as obstructive apnea . . . to account for the fatigue." He further noted that "insomnia is a significant issue" and suspected that it was "tied up with her depression and PTSD." AR 385. Dr. Westerman nonetheless ordered a polysomnogram, which led him to rule out sleep apnea. "The main polysomnographic abnormality was that of alpha intrusions throughout the study," he noted. AR 388. He continued, "this could, however, be related to residua from her December illness with current symptoms of knee and elbow discomfort." AR 388.

In January 2008, Plaintiff began treating with a new primary care physician in the Richmond area, Dr. Keith Crossen. After reviewing medical records and additional laboratory panels, Dr. Crossen arrived at a diagnosis for CFS. AR 904-905. According to the Centers for Disease Control, a diagnosis of CFS requires:

> 1. Clinically evaluated, unexplained persistent or relapsing chronic fatigue that is of new or definite onset (i.e., not lifelong), is not the result of ongoing exertion, is not substantially alleviated by rest, and results in substantial [reduction] in previous levels of occupational, educational, social, or personal activities.

2. The concurrent occurrence of four or more of the following symptoms: substantial impairment in short-term memory or concentration; sore throat; tender lymph nodes; muscle pain; multi-joint pain without swelling or redness; headaches of a new type, pattern, or severity; unrefreshing sleep; and post-exertional malaise lasting more than 24 hours. These symptoms must have persisted or recurred during 6 or more consecutive months of illness and must not have predated the fatigue.

AR 933. In addition to identifying the persistent presence of four or more symptoms, as required by the CDC criteria, Dr. Crossen stated that he based his diagnosis on laboratory tests excluding other causes for Ms. Van Valen's symptoms, "chronic unremitting fatigue" lasting for 21 months, and exclusion of other possible causes of fatigue, including polypharmarcy, depression, and affective disorder. AR 904. Generally, Dr. Crossen excluded these other potential causes of fatigue because Ms. Van Valen was exposed to these causes well in advance of the onset of her profound fatigue in late 2006. AR 903. Dr. Crossen also noted that the onset of symptoms after her illness in 2006 was consistent with literature linking CFS with "a viral or post-viral syndrome." AR 905.

## B.

In February 2007, shortly after Ms. Van Valen began seeing Dr. Crossen, Unum first informed her of its decision to deny her long term disability claim. AR 660. Unum reasoned that a number of Plaintiff's ailments – fatigue, back pain, bronchitis, asthma, depression, anxiety, sleep disorder/insomia, tremors/shaking, and migraine headaches – were excluded by a pre-existing conditions clause. Furthermore, her remaining conditions, fever of unknown origin and sinusitis, did not "result in limitations which would preclude the insured from performing her occupation." AR 719. The letter summarized the findings of several medical professionals to the effect that Ms. Van Valen's claims were "not supported." AR 663. Unum's conclusion also rested on the lack of "explanation" for Plaintiff's chronic fatigue, and "no consensus among [her]

4

treating providers about [her] inability to work." AR 663.

The record also includes the findings of Dr. E.C. Curtis, M.D., who noted that Ms. Van Valen's "fatigue seems to be explained quite well by her affective disorder, by her reportedly disturbed sleep (that in turn mirrors her anxiety) and is likely aggravated by her poor sleep hygiene . . . as well as by the polypharmacy in use here." AR 550. Dr. Gary Greenwood opined that "submitted materials do not support that alleged fever and fatigue either exist or, if they do, have been sufficiently severe to have precluded full-time work." AR 642.

On July 23, 2008, Plaintiff, through counsel, appealed Unum's decision. AR 705. Plaintiff's counsel requested an extension of the deadline to submit additional information on appeal, in part so that Plaintiff could submit records related to Dr. Crossen's diagnosis. *Id.* Unum granted an extension until September 5, 2008. Shortly before that deadline passed, Plaintiff's counsel again requested an extension. Plaintiff's counsel noted that the records from Dr. Crossen did not contain an opinion of impairment, and that counsel needed further time to submit materials. *Id.* This time, Unum denied the request, but informed counsel that "any information received during the appellate review will be considered." *Id.* Unum completed its appellate review on October 16, 2008, before Plaintiff had submitted additional materials. AR 886. On November 18, 2008, Plaintiff's counsel then submitted additional medical records and a letter from Dr. Crossen, which included Dr. Crossen's diagnosis of CFS, and Dr. Crossen's impairment finding. AR 888-905. Although it had already completed its appellate review, Unum agreed to review the new information. AR 888.

Upon review of the new records, Brad Stuman, RN, concluded that they did "not indicate any significant change in the insured's report of debilitating fatigue." AR 983. An additional review by Dr. Beth Schnars further concluded that Ms. Van Valen had "undergone an extensive

5

diagnostic work-up which has been unrevealing. . . The symptoms of fatigue and fever are self-reported and would not have supported R/L's that would preclude [return to work]." AR 991. Dr. Schnars also disagreed with Dr. Crossen's diagnosis of CFS. In a letter dated December 11, 2008, she attempted to elicit further information from Dr. Crossen, including information as to: (1) the documentary basis of Dr. Crossen's diagnosis of CFS; (2) the manner by which Dr. Crossen arrived at the conclusion that Ms. Van Valen had no work capacity; and (3) whether Plaintiff's history of behavioral health issues are a contributing factor in Plaintiff's fatigue. AR 988. Dr. Crossen did not reply.

## II. STANDARD OF REVIEW

This case is brought under the Employee Retirement Income Security Act of 1974 ("ERISA"). 29 U.S.C. § 1001 *et seq*. ERISA empowers a participant in or beneficiary of an employee benefits plan to recover benefits or enforce rights under the plan. 29 U.S.C. § 1132(a)(1)(B). When a district court reviews a plan administrator's decision to deny benefits, four principles of law govern the determination of the appropriate standard of review for such cases: (1) courts should be "guided by principles of trust law," treating plan administrators as fiduciaries with "a special duty of loyalty to the plan beneficiaries;" (2) unless the plan provides otherwise, a denial of benefits is reviewed *de novo*; (3) however, if the plan grants the administrator discretion to determine eligibility, courts must use a deferential standard of review; and (4) if the administrator has discretionary authority, the presence of a conflict of interest should be "*weighed as a factor* in determining whether there is an abuse of discretion." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 S.Ct. 2343, 2347-48 (2008)(quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 113-115 (1989) (emphasis in original) (internal quotation marks omitted).

Where the plan grants the administrator discretionary authority, "it is well-settled that courts review the denial of benefits under [the] policy for 'abuse of discretion.'" *Guthrie v. Nat'l Rural Elec. Coop. Ass'n Long-Term Disability Plan*, 509 F.3d 644, 649 (4th Cir. 2007). *See also Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 341 (4th Cir. 2001). Discretionary authority may be express or implied. *Woods v. Prudential Ins. Co. of America*, 528 F.3d 320, 322 (4th Cir. 2008). In this case, the Policy expressly grants Unum "discretionary authority to make benefit determinations." AR 00871. It further notes that "[w]hen making a benefit determination under the Policy, Unum has discretionary authority to determine your eligibility for benefits . . . ." AR 840. The court will therefore review Defendant's denial of benefits for abuse of discretion.

Defendants concede that there is a "structural conflict of interest" in this case. (docket no. 19) Such a conflict is "a common feature of ERISA plans" in that "the lion's share of ERISA plan claims denials are made by administrators that both evaluate and pay claims." *Glenn*, 128 S.Ct. at 2353 (Roberts, J. concurring) (internal quotation marks omitted). Nonetheless, the court must take this conflict into account as a "factor" in evaluating whether there has been an abuse of discretion. *Glenn*, 128 S.Ct. at 2351.

While district courts have some leeway to determine how much weight to accord such a factor, the Supreme Court has suggested that the conflict "should prove more important (perhaps of great importance) where . . . an insurance company administrator has a history of biased claims administration." *Id*. In so doing, the Court cited with approval John H. Langbein, *Trust Law as Regulatory Law*, 101 NW. U. L. REV. 1315, 1317-21 (2007)) (emphasis added). The passages cited describe just such a history for Unum's parent company, Unum Group:[4]

Many federal courts have now commented on Unum's aggressive claims denial practices.

---

[4] The article refers to UnumProvident Corporation, which changed its name to Unum Group in 2007. Unum Group is the parent company of Unum Life Insurance Company of America. Press Release, Unum Group, UnumProvident Corp. Now Unum Group (Mar. 2, 2007).

7

> Published opinions speak of "selective review of the administrative record," "lack of objectivity and an abuse of discretion by Unum," misuse of "ambiguous test results," and claims evaluation practices that "defie[d] common sense" and "bordered on outright fraud." In a notable opinion in the district court in Massachusetts, Chief Judge Young collected citations to nearly twenty previous cases that he described as "reveal[ing] a disturbing pattern of erroneous and arbitrary benefits denials, bad faith contract misinterpretations, and other unscrupulous tactics."

Langbein, *supra,* at 1320 (citations omitted). On the other hand, the Court also noted that the conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . ." *Id.*

Defendant's counsel urges that the court should take into consideration Unum's willingness to extend the deadline for submitting materials germane to Ms. Van Valen's appeal, and then Unum's willingness to consider additional information submitted, even after the extended deadline had passed. I agree. Even if Unum has a checkered history, Unum's liberal appeals process in this case mitigates the importance of that history. The court will therefore accord Unum's conflict of interest neither great importance, nor vanishingly little importance, but some intermediate level of importance in determining whether Unum abused its discretion.

Generally, a court will not find that a plan administrator abused its discretion where the decision was "reasonable," even if the reviewing court would have come to an opposite conclusion. *Piepenhagen v. Old Dominion Freight Line, Inc.*, No. 09-1248, 2010 WL 3623225, at 3 (4th Cir. 2010) (unpublished opinion) (citing *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997)). A reasonable decision is one which is "the result of a deliberate, principled reasoning process and it if is supported by substantial evidence." *Piepenhagen,* 2010 WL 3623225 at 3, (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997) (quotation omitted)). "Substantial evidence" is "more than a scintilla" but less than a preponderance. *See Newport News Shipbuilding and Dry Dock Co. v. Cherry*, 326 F.3d 449, 242 (4th Cir. 2003).

### III. DISCUSSION

According to the Policy, in order to prevail on a claim for long term disability benefits, Ms. Van Valen must show, among other things, the cause of her disability, and "the extent of [her] disability, including restrictions and limitations preventing [her] from performing [her] regular occupation." AR 835. Plaintiff claims that the cause of her disability is CFS, and that it completely prevents her from working. Defendant counters with two theories: (1) Dr. Crossen's diagnosis of Chronic Fatigue Syndrome was improper; and (2) even if Dr. Crossen's diagnosis was not improper, Ms. Van Valen has presented no objective evidence of functional impairment to support her claim of total disability. (docket no. 23).

### A.

Because the matter is adequately decided on the basis of Defendant's second theory, the court need not decide whether Unum's decision to disregard Dr. Crossen's diagnosis of CFS was unreasonable. However, I note that Defendant's insistence that a diagnosis of Chronic Fatigue Syndrome be proven by objective evidence is problematic. Defendant's briefs repeatedly emphasize that many of Ms. Van Valen's test results were normal, but this is to be expected in a CFS case. There is no one diagnostic test for CFS. Instead, the diagnosing physician first tests for other possible causes of the patient's fatigue, and when those tests are unavailing, he then determines whether certain symptoms have persisted for more than six months. Over the course of treatment, the diagnosing physician develops an opinion of the credibility of the patient's claims of extreme fatigue, relying (perhaps to a large extent) on the patient's subjective reports of fatigue. Presumably, the treating physician will withhold diagnosis of CFS where he suspects fraud or exaggeration.

Defendant's insistence that the insured prove by objective evidence the existence of a

disease which is not readily so proven is tantamount to saying that it will not provide coverage for such a disease. If that is in fact Defendant's policy, Defendant should say so explicitly in its plan documents. That would give more certainty to both the insurer and the insured, and allow future parties to resolve these issues out of court.

**B.**

Nonetheless, numerous courts have held, and this court agrees, that there is a difference between requiring objective proof of Chronic Fatigue Syndrome, and objective proof of impairment. In adopting this position, I follow the rationale of the district court in *Linich v. Broadspire Services, Inc.*, 2009 U.S. Dist. LEXIS 24653 at 14 (D. Ariz. 2009):

> There is a world of difference between requiring [Plaintiff] to prove the accuracy of her CFS or Fibromyalgia diagnosis with something like a simple blood test, which does not exist, and requiring [Plaintiff] to submit additional evidence, objective or otherwise, in order to verify the severity of her symptoms. The latter would be a proper request while the former would not.

*See also Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 322 (7th Cir. 2007) ("[a] distinction exists . . . between the amount of fatigue or pain an individual experiences, which . . . is entirely subjective, and how much an individual's degree of pain or fatigue limits his functional capabilities, which can be objectively measured."); *Boardman v. Prudential Ins. Co. of America*, 337 F.3d 9, 16 n. 5 (1st Cir. 2003) ("While the diagnosis of chronic fatigue syndrome and fibromyalgia may not lend themselves to objective clinical findings, the physical limitations imposed by the symptoms of such illnesses do lend themselves to objective analysis.")

It is not unreasonable for a plan administrator to require objective proof of the extent of impairment. To hold otherwise would invite fraudulent claims, and would, in the long run, be detrimental to all concerned parties. I note also that the phenomenon of insurance carriers requiring objective evidence in CFS claims is well known. The CFIDS Association of America

writes:

> To obtain [long term disability] benefits, claimants must first prove that they are disabled, per the requirements of their individual policies. In the case of CFS, this can be complicated, as some policies require "objective proof" of disability before payment can begin. . . . Some tests that have been used to objectively prove disability due to CFS are exercise capacity tests, tilt-table tests [and] advanced neurocognitive assessments.

CFIDS Association of America, *Legal Issues: Long-Term Disability*, (Oct. 5, 2010, 11:18 a.m.), http://www.cfids.org/resources/long-term-disability.asp. In addition, a number of academic articles have shown that tests can objectively show decreased cognitive performance in patients with CFS. *See* D.B. Cook *et al*, *Exercise and Cognitive Performance in Chronic Fatigue Syndrome*, 37 MED. & SCI. IN SPORTS & EXERCISE 1460 (2005); G. Lange *et al*, *Objective Evidence of Cognitive Complaints in Chronic Fatigue Syndrome: a BOLD fMRI Study of Verbal Working Memory*, 26 NEUROIMAGE 513 (2005).

It also is worth noting that in determining whether an individual is eligible for Social Security benefits, the Social Security Administration asks that individuals with Chronic Fatigue Syndrome provide "information . . . that will help us determine the existence, severity, and duration of the person's impairment(s). . . [including] the results of any mental status examination." Soc. Sec. Admin, *Providing Medical Evidence to the Social Security Administration for Individuals with Chronic Fatigue Syndrome – FACT SHEET*, (Oct. 3, 2010, 4:50 p.m.), http://www.socialsecurity.gov/disability/professionals/cfs-pub063.htm.

Both Dr. Kaplan and Dr. Crossen opined at various points that Ms. Van Valen is not capable of full time work. AR 111-12; 0610; 904-905. But it is not clear that their opinions were based on anything other than Ms. Van Valen's subjective reports. This is underscored by Dr. Kaplan's initial assessment in December 2006, "*[a]s per patient*, not able to work." AR 42 (emphasis added). Plaintiff rightfully points out that there is "no evidence plaintiff actually is

able to perform her usual daily activities such as observations from third parties, photographs, witness testimony, etc." (docket no. 20). But the Policy makes clear that it is Plaintiff's burden to prove the extent of disability. AR 835. In light of the interests of plan administrators in preventing fraud, it was not unreasonable for Unum to require Plaintiff to meet her burden by providing objective evidence.

It is also significant that Ms. Van Valen had numerous opportunities to buttress the record in this case. Unum was solicitous of her attorney's requests to extend deadlines to file additional evidence of disability, even though there does not appear to have been any legal requirement that it do so. Plaintiff could have used those opportunities to provide further objective proof of her impairment, but she did not. Because the record does not contain significant objective evidence backing her physician's impairment findings, Defendant's decision to deny Ms. Van Valen's long term disability benefits claim was reasonable and supported by substantial evidence in the record.

### IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment will be DENIED and Defendant's motion for summary judgment will be GRANTED.

An appropriate order will follow.

The Clerk of the Court is directed to send a certified copy of this memorandum opinion and the accompanying order to all parties and all counsel of record.

Entered this  6th  day of October, 2010.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE